# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ALLAN A. PETERSEN,

        Plaintiff,

v.                                  Civil Action No. 3:08cv180
                                  (Judge Bailey)

ANDURAY E. WHITE, VERONICA
FERNANDEZ, RODNEY BUCKLEW,
D. YOST, SUSAN S. MCCLINTOCK,
DOMINIC A. GUTIERREZ, L. LEESON,
B. CALLAHAN, ANYA KOVSCEK,
ROBERT TRYBUS, WILLIAM LAYHUE,
ERIC ELZA, ELIZABETH SANDERS,
N. JUNKINS, E. MALLORY, LT. WILLIAMS,
CORRECTION OFFICER THOMPSON, J. RAMOS
AND CORRECTION OFFICER HENDERSON,

        Defendants.

## REPORT AND RECOMMENDATION

### I.  Procedural History

On April 23, 2009, the *pro se* plaintiff filed a civil rights action. (Dckt. 1) On January 20, 2009, he amended the complaint to add additional defendants. (Dckt. 10) After the plaintiff paid his initial partial filing fee on February 27, 2009, the undersigned conducted a preliminary review of the file.

In the subsequent report and recommendation ("R&R"), the undersigned recommended that several of the defendants be dismissed and that service of process be effected upon the remaining defendants. (Dckt. 19) The R&R was adopted in its entirety on July 29, 2009. (Dckt. 21)

After the remaining defendants were served, the Court granted them several extensions of

time to file an answer to the complaint.  On May 11, 2010, the defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.  (Dckt. 72) Their memorandum in support was filed on May 12, 2010.  (Dckt. 75)

Because the plaintiff is proceeding without counsel in this case, the Court issued a <u>Roseboro</u> Notice on May 17, 2010, advising the plaintiff of his right to file a response to the defendants' motion.  (Dckt. 76) The plaintiff has not filed a response.

## II.  <u>Contentions of the Parties</u>

### A.  <u>The Complaint</u>

The plaintiff, a federal inmate formerly incarcerated at the Federal Correctional Institution in Morgantown, West Virginia ("FCI-Morgantown"), initiated this civil case against the defendants for alleged violations of his constitutional rights.  (Dckt. 1)  Specifically, the plaintiff asserts that the defendants unlawfully censored his incoming and outgoing legal mail correspondence after he signed a Bureau of Prison ("BOP") form 407 which mandates that no staff shall receive, open, read or deliver any general correspondence.  <u>Id.</u> at 1.  Instead, general correspondence was to be returned, unopened, to the United States Postal Service.  <u>Id.</u>  Moreover, the plaintiff complains of retaliation and harassment as a result of his reporting these violations in the Bureau's administrative remedy program and by filing several civil complaints in federal court.  As a result of these alleged constitutional violations, the plaintiff seeks monetary damages from the defendants.  <u>Id.</u> at 19.

In support of his claims, the plaintiff asserts that he was transferred to FCI-Morgantown on February 2, 2006.  <u>Id.</u> at 8.  At that time, he was placed in the Byrd Unit and defendant William Layhue ("Layhue") was assigned as his counselor.  <u>Id.</u>

In March of 2006, the plaintiff requested his legal property be brought from the "ISM

holding area" so he could work on his pending legal actions. Id. The plaintiff's property was searched before it was given to him by defendant Rodney Bucklew ("Bucklew"). Id.

On March 20, 2006, the plaintiff was called to the "ISM" mailroom to receive his personal property. Id. The plaintiff allegedly informed Bucklew at that time that he had a pair of work boots and two beard trimmers in his personal property that he was permitted to use while housed at the Seymour Johnson Federal Prison Camp ("FPC-Seymour Johnson"). Id. However, according to the plaintiff, Bucklew told defendant Anya Kovscek ("Kovscek") that he found the boots during a search of the plaintiff's property and that the plaintiff had attempted to conceal them. Id. at 8-9. The plaintiff was placed in the Special Housing Unit ("SHU") and charged with an incident report. Id. at 9. He was released back to the compound the next day. Id.

The plaintiff asserts that he filed an administrative remedy about the incident within 10 days thereafter. Id. In the remedy, the plaintiff allegedly argued that he did not attempt to smuggle the boots and beard trimmers into the facility. Id. Instead, he contended that he told Bucklew that the items were in his property. Id. The plaintiff asserts that the remedy was "kicked back" to the institution for further investigation during his regional appeal. Id. Moreover, he asserts that he also argued that he was being discriminated against because other inmates in similar circumstances had been allowed to keep their boots and beard trimmers from Seymour Johnson without incident.[1] Id. The plaintiff asserts that his "claims" were held for at least a month in the "ISM" and delivered late to the Regional Office causing them to be dismissed as untimely. Id. This was, as the plaintiff

---

[1]It appears that the boots and beard trimmers were sold at the commissary at FPC-Seymour Johnson and were approved for use at that facility. (Dckt. 1 at 8-9). Nevertheless, it appears that those same boots and beard trimmers were not permitted at FCI-Morgantown and were considered contraband at that facility. Id.

asserts, "the beginning of the mail tampering." Id.

In June of 2006, through general correspondence, the plaintiff's parents sent him newspaper clippings and articles about the Carnival Parade in the Virgin Islands. Id. at 10. The plaintiff asserts that those clippings and articles were destroyed by "the defendants." Id. The plaintiff suggests that if the articles were not permitted, the defendants should simply have returned them to his parents.[2] Id. However, the plaintiff asserts that other inmates that were housed in his unit were permitted to receive such articles and clippings. Id.

On July 17, 2006, the plaintiff filed a civil rights complaint in this Court. Id.; see also 3:06cv72. In that case, the plaintiff asserted that officers Eric Elza ("Elsa") and Robert Trybus ("Trybus") stripped him of certain legal materials and then immediately changed his job detail to the least desirable detail at the facility. Id. Moreover, the plaintiff asserted that Elza and Trybus "coerced" him into eating at the early meal. Id. Because the plaintiff preferred to eat later, and did so, he received at least one incident report with respect to that matter. Id. However, that incident report was later dismissed. Id.

Also in July of 2006, the plaintiff asserts that Trybus, N. Junkins ("Junkins"), E. Mallory ("Mallory"), Elza and Kovscek, "orchestrated a (sic) unlawful search and seizure of [his] entire legal property after the court returned notice of the filing of the complaint." Id. at 11. In addition, he asserts that his property was loaded on to the back of a John Deere Gator and transported to an office. Id. It was there that Trybus and Kovscek directed, searched and confiscated the plaintiff's writ of certiorari and supporting memorandum. Id. The plaintiff then notes that coincidentally, just

_____

[2]Defendant Anduray White ("White") informed the plaintiff that such clippings and articles were not permitted per BOP policy. (Dckt. 1 at 10)

the day before, the defendants had received the administrative remedy which was returned for further investigation of the plaintiff's complaints about the mailroom. Id. at 12. The plaintiff further alleges that, on that same date, Bucklew and D. Yost ("Yost") opened his certified mail outside of his presence and copied the contents of letters received from his attorney and family. Id. Those defendants allegedly "proclaimed that Plaintiff has a family member in the regional office," and speculated that such relative was the reason the plaintiff's remedy had been returned for further investigation. Id. The plaintiff contends that his alleged relative in the Regional Office is presumably the reason for his legal property being confiscated the next day. Id.

Next, the plaintiff asserts that he was retaliated against by the defendants. Id. The plaintiff contends that he was told by the Disciplinary Hearing Officer ("DHO") that the confiscated work, boots and beard trimmers could be mailed home. Id. Nonetheless, the plaintiff asserts that his work boots and beard trimmers were held in the "ISM" department and his boots eventually destroyed,[3] even though his time for mailing the property home had not expired and his administrative remedy on the issue was still pending. Id. at 12-13. Thus, the plaintiff asserts that the destruction of his boots violated BOP policy and procedure. Id. at 13.

On August 21, 2006, the plaintiff signed an Acknowledgment of Inmate Form BP 407, discontinuing all staff in "ISM" and the mail room from receiving, opening, reading and delivering any incoming general correspondence. Id. The only mail that the plaintiff authorized staff to forward to him was special or legal mail, which may only be opened in his presence. Id. Therefore, the plaintiff asserts that all general correspondence addressed to him after August 21, 2006 was not authorized for inspection or examination and was to be unopened and returned back to the sender.

---

[3]The plaintiff mailed his beard trimmers home on July 11, 2006. (Dckt. 1 at 13).

Id.  Nonetheless, the plaintiff asserts that defendants White and Veronica Fernandez ("Fernandez") failed to comply with the applicable rules and continued to open and deliver the plaintiff's general correspondence and legal mail through normal mail procedures.  Id. at 13-14.  The plaintiff asserts that the defendants misconduct and mail tampering after August 21, 2006, caused the loss of his writ of certiorari and supporting memorandum and ultimately resulted in the inability to timely file those documents with the Supreme Court.  Id. at 14.

The plaintiff also contends that "the defendants" withheld his administrative remedy appeal from his DHO hearing, causing it to be untimely.  Id. at 15.  Then, when the Regional Office requested proof of timeliness on BOP letterhead, the defendants refused to do so.  Id.  Instead, defendant Layhue simply signed and dated the bottom of the administrative remedy.  Id.  That remedy was again rejected by the Regional Office because staff failed to verify its timeliness on BOP letterhead.  Id.  The plaintiff was allegedly told by Layhue that he was not permitted to provide a response on BOP letterhead, per defendant Fernandez.  Id.  Because of these actions, the plaintiff asserts that he was not able to have his charges overturned.  Id.  The plaintiff further asserts that Fernandez harassed him and filed false or erroneous incident reports about him.  Id. at 15-16.  The plaintiff asserts that none of those reports resulted in any further charges, thereby substantiating his claim that they were written for the sole purpose of harassing him.[4]  Id. at 16.

The plaintiff asserts that all of the harassment and retaliation was a direct result of his filing

_____

[4]The undersigned fails to see how the issuance of incident reports without further charges substantiates the plaintiff's claim of harassment and retaliation.  Not every incident report does or has to result in further charges.  An incident report merely reports bad behavior.  It is the subsequent investigation of that report which determines whether further charges should be pursued.  In fact, were the defendants harassing and retaliating the plaintiff, it seems more likely that the incident reports would have been recommended for further charges.

lawsuits in federal court and administrative remedies against the defendants.  Id.  The plaintiff also asserts that the defendants opening and reading of his mail after he had signed the BOP form 407 is more evidence of harassment and retaliation.  Id. at 17.  The plaintiff asserts that he spoke with defendants McClintock and Gutierrez about these incidents but that they failed to assist him in these matters.[5]  Id.

Finally, the plaintiff complains that his legal and special mails sent from the institution to the district court were opened, read and had documents removed, which disrupted the plaintiff's communications with the Court.  Id. at 18.  The plaintiff asserts that not only did this violate BOP policy, but also his "rights."  Id.  The plaintiff also accuses the defendants of holding back his mail to the Court which caused him to have to seek extensions of time from the court.  Id.  In fact, the plaintiff asserts that in 3:06cv72 the defendants' actions caused a motion to be untimely and therefore, not considered by the Court before it dismissed his case.  Id. at 19.

**B.    The Amended Complaint**

On January 20, 2009, the plaintiff filed an "Addendum to the Complaint" in which he amended the complaint to add additional defendants.  (Dckt. 10) Specifically, the plaintiff added the following defendants:

(1) Elizabeth Sanders ("Sanders");

(2) N. Junkins;

(3) E. Mallory;

(4) Correction Officer Williams ("Williams");

---

[5]Dominic Gutierrez was the Warden at FCI-Morgantown at that time and Susan McClintock was an Associate Warden.

(5) Correction Officer Thompson ("Thompson");

(6) J. Ramos ("Ramos"); and

(7) Correction Officer Henderson ("Henderson").

As to defendant Sanders, the plaintiff asserts that she harassed and retaliated against him by filing false incident reports related to his work on the compound and his eating schedule. Id. at 1-2. During this time, the plaintiff also alleges that he was paid less than the other inmates on the same work detail. Id. at 2. He does not, however, allege that defendant Sanders had any involvement in his pay classification. Id.

As to defendants Junkins and Mallory, the plaintiff asserts that these defendants removed his legal property and placed it on the John Deere Gator on August 1, 2006, and transported it to the administration building. Id. at 2-3.

As to defendant Williams, the plaintiff asserts that Williams is a Lieutenant who worked in the SHU when the plaintiff was housed there between April 17, 2006 and May 1, 2006. Id. at 3. Lt. Williams allegedly harassed and retaliated against the plaintiff by not allowing him to have any of his legal work in his cell or to receive any telephone calls from his family. Id.

As to defendant Thompson, the plaintiff asserts that he was a regular corrections officer who worked in the SHU while the plaintiff was held there. Id. Thompson allegedly confiscated the plaintiff's radio and then threatened the plaintiff after he asked for a property sheet for the radio. Id. The plaintiff contends that he never saw his radio again after that. Id. at 4.

Next, the plaintiff alleges that Fernandez and White infringed on his rights when they

confiscated a complaint that he prepared for the Post Office Inspector.[6] Id. Moreover, the plaintiff requested that Fernandez and White provide him with the address for the United States Post Office that serves FCI-Morgantown. Id. The plaintiff says that instead of providing him with the appropriate address, Fernandez and White gave him the address for FCI-Morgantown. Id. Nonetheless, the plaintiff prepared the complaint and sent it certified mail to the Post Master at the address provided by Fernandez and White. Id. The plaintiff also copied the envelope because he believed that the defendants would tamper with his complaint. Id. The plaintiff asserts that his complaint was lost and never returned to him. Id. at 5.

According to the plaintiff, White also intentionally misinformed him that mail from the United States District Courts did not constitute special or legal mail. Id. The plaintiff asserts that White told other inmates that mail from a United States District Court did constitute special or legal mail. Id. The plaintiff asserts that the damage from this information was then perpetuated by other staff members who continued to open and read all of his mail from the United States District Courts. Id. Because of this, the plaintiff sought relief from the District Court. Id. The plaintiff alleges that the Court declared that the defendants were to treat his mail from the Court as special or legal mail and to stop returning it to the Court. Id. The plaintiff was then granted special permission from Fernandez to receive his mail from the United States Courts. Id.

Next, the plaintiff asserts that the defendants violated his access to the courts, and specifically, the Supreme Court, by deliberately returning his communications back to the Court. Id. at 5-6. The plaintiff asserts that the defendants' actions hindered and obstructed his access to the

---

[6] The plaintiff's complaint to the Postal Inspector alleged tampering with his mail by mailroom staff at FCI-Morgantown. (Dckt. 10 at 4)

Court and caused him irreparable harm, as he missed the deadline to file a second writ he prepared for his habeas corpus case.  Id. at 6.

The plaintiff asserts that despite the fact that he received mail from the Court labeled "special mail open only in inmate's presence," that mail was opened and delivered to him during regular mail call.  Id. at 7-9.  Additionally, on December 7, 2006, the plaintiff placed an appeal of his DHO findings in the hands of defendant Layhue for mailing to the Regional Office.  Id. at 8.  The plaintiff then asserts that Fernandez, White and the remaining defendants, conspired to intentionally withhold his administrative appeal in the mailroom and deliver it late to the Regional Office so that it would be rejected as untimely filed.  Id.

As to defendant Henderson, the plaintiff asserts that on May 15, 2007, Henderson worked as a corrections officer in the Byrd Unit where the plaintiff was housed.  Id. at 9.  In addition, on that date, Henderson delivered mail to the plaintiff that was from the District Court and that had been treated as general correspondence.  Id.

After that, the plaintiff was allegedly told by Fernandez, Gutierrez and McClintock that if he would eliminate some of his administrative remedies on mail tampering, they would request that he be transferred to another facility.  Id.  This deal was allegedly brokered in defendant Ramos' office.  Id.  The plaintiff asserts that because of this deal, several of his administrative remedies were destroyed.  Id.  As a part of this arrangement, the plaintiff also allegedly agreed to not file any more administrative remedies.  Id. at 10.  The plaintiff asserts that once this portion of the agreement was made known to staff, they increased their harassment and retaliation.  Id.  Based on these accusations, the plaintiff asserts that Ramos is liable in this action because he played the role of mediator to an illegal agreement.  Id. at 11.

## C.    The First Report and Recommendation

In the first R&R, the undersigned recommended that defendants McClintock, Gutierrez and Elza be dismissed from this action with prejudice because their involvement was merely supervisory or in an official capacity and that such claims are not a basis for liability.  (Dckt. 19 at 4-5).  The undersigned also found that the plaintiff's claims against defendants Trybus, Junkins and Mallory had already been raised in case number 5:07cv 53, and that those claims should be dismissed from this case without prejudice to the plaintiff's right to have those claims heard in that case.  Id. 5-6.

Next, the undersigned noted that the plaintiff failed to allege that defendant Ramos was personally involved with any violation of his rights.  Id. at 6-7.  Instead, the plaintiff merely asserted that Ramos was a mediator to an illegal agreement and that his testimony could "shine light" on the facts of the case.  Id. at 6.  For similar reasons, the undersigned also recommended the dismissal of defendants Henderson and Layhue.  Id. at 7.

However, in examining the plaintiff's claims against White, Fernandez, Bucklew, Leeson, Callahan and Kovscek, the undersigned found that the plaintiff had specifically alleged that each of these defendants was involved in the improper handling of his mail.  Id. at 7-8.  Thus, the undersigned recommended that those defendants be made to answer the complaint.  Id. at 8. Likewise, the undersigned found that the plaintiff had asserted that Sanders, Williams and Thompson all retaliated or harassed him for filing administrative grievances or civil complaints. Id. Therefore, the undersigned also recommended that these defendants be made to answer the complaint.  Id.

The plaintiff did not object to the R&R, and on July 29, 2009, it was adopted in its entirety. (Dckt. 21) As a result, defendants McClintock, Gutierrez, Trybus, Layhue, Elza, Junkins, Mallory,

Ramos and Henderson were dismissed from this case.  Id.  Thus, the only defendants that remain

in this case are White, Fernandez, Bucklew, Yost, Leeson, Callahan, Kovscek, Sanders, Williams

and Thompson.

**D.    The Defendants'[7] Motion to Dismiss or for Summary Judgment**

In their motion, the defendants assert that the plaintiff was committed to the BOP for service

of a 188-month federal sentence imposed by the United States District Court for the District of the

Virgin Islands.  (Dckt. 75 at 2)  He was originally committed to the custody of the BOP on

September 11, 1996.  Id.  From April 28, 2004 through February 2, 2006, the plaintiff was

designated to FPC-Seymour Johnson in North Carolina.  Id.  He was transferred to FCI-Morgantown

on February 2, 2006, where he was incarcerated until May 30, 2007.  Id.  On July 30, 2009, the

plaintiff was released from the custody of the BOP after completion of his sentence.  Id.

According to the defendants, during the plaintiff's incarceration at FCI-Morgantown, he

submitted 159 administrative remedies and filed six civil cases in the district court.  Id. at 3-4.  The

plaintiff's litigation history is as follows:

(1)  Case number 3:06cv72 - alleging that he was subjected to retaliation and treated
differently from other inmates after filing administrative remedies.  Case dismissed for the
failure to exhaust and for the failure to state a claim upon which relief could be granted.

(2)  Case number 5:06cv106 - alleging the BOP violated his right to the free exercise of
religion by failing to provide him a kosher diet.  Case dismissed with prejudice on the merits.

(3)  Case number 3:06cv114 - alleging denial of access to the courts and the tampering with
and improper handling of his mail.  Case dismissed without prejudice for the failure to
exhaust administrative remedies.

---

[7]From this point forward, the term, "the defendants," refers only to the remaining defendants,
to wit, White, Fernandez, Bucklew, Yost, Leeson, Callahan, Kovscek, Sanders, Williams and
Thompson.

(4) <u>Case number 2:06cv118</u> - case identical to 3:06cv114.  Case dismissed without prejudice to the plaintiff's right to proceed with case number 3:06cv114.

(5) <u>Case number 5:07cv53</u> - alleging denial of access to the courts and that he was subjected to retaliation for filing complaints in district court.  Case dismissed with prejudice on the merits as to plaintiff's claim of denial of access to the courts and without prejudice for the failure to exhaust as to the plaintiff's retaliation claims.

(6) <u>Case number 3:08cv180</u> - the instant case.

<u>Id.</u>

Next, the defendants explain the BOP's correspondence policies and procedures.  <u>Id.</u> at 5-6.

They state:

> The BOP has established correspondence procedures to allow inmates to send and receive mail while incarcerated.  These rules are codified at 28 C.F.R. Part 540, Subpart B.  Pursuant to these Rules, following are the two basic types of correspondence:  general correspondence and special mail.  **General correspondence** is all incoming or outgoing correspondence other than special mail.  28 C.F.R. § 540.2(a).  **Special mail** includes correspondence <u>sent to</u> the U.S. Department of Justice (<u>including</u> the BOP), U.S. Attorneys Offices, and U.S. Courts.  Special mail also includes correspondence <u>received from</u> the U.S. Department of Justice (<u>excluding</u> the BOP but including U.S. Attorneys), U.S. Courts, and other federal law enforcement agencies.  For incoming correspondence to be processed under the special mail procedures (see §§ 540.18 - 540.19), the sender must be adequately identified on the envelope and the front of the envelope must be marked "Special Mail - Open only in the presence of the inmate."  28 C.F.R. § 540.2(c).  This language is contained in its entirety and further implementing language is delineated in BOP Program Statement 5265.11, <u>Correspondence</u>.
>
> As a security measure, staff shall open and inspect all incoming general correspondence and may read it as frequently as deemed necessary to maintain security.  28 C.F.R. § 540.14(a).  Outgoing general correspondence may be sealed by the inmate at low and minimum security level institutions such as FCI Morgantown.  28 C.F.R. § 540.14(c)(1).  However, if there is reason to believe such correspondence would interfere with the orderly running of the institution or facilitate criminal activity, such outgoing general correspondence may be opened by staff.  28 C.F.R. § 540.14(c)(1)(I).
>
> Upon their arrival at an institution, inmates are informed (or reminded) that their incoming general correspondence may be opened and

read by staff. Therefore, inmates may elect whether to receive general correspondence or have it returned to the sender. 28 C.F.R. § 540.12(b).

Id. at 5-6 (emphasis in the original).

As to the plaintiff in this case, the defendants asserts that the plaintiff's prior employment history as a corrections officer rendered him to be a particular management and security concern, presumably because of his knowledge of policies and procedures. Id. at 7. The defendants further note that on August 21, 2006, the plaintiff executed BOP Form 407, choosing not to receive general correspondence. Id. The plaintiff requested instead that his general correspondence be returned to the sender without being opened or inspected. Id. The defendants assert that although they honored the plaintiff's request, within a few days, the plaintiff attempted to circumvent institution security measures by having his general correspondence sent to him through another inmate. Id. The plaintiff received incident reports for this behavior. Id.

On August 31, 2006, after the plaintiff had complained that he was not receiving his administrative remedy responses, defendant Fernandez told the plaintiff that she would treat his mail from the Regional Office with special accommodation. Id. Although those responses were not considered special mail, and would not be logged in as such, the plaintiff would nonetheless receive those responses as if they were special mail. Id.

Subsequently, the United States District Court began labeling the plaintiff's mail as "special mail to be opened only in inmate's presence" after the plaintiff complained to the Court that he was not receiving his mail from it. Id. at 8. Therefore, defendant Fernandez also made special accommodation for the plaintiff's mail received from the District Court and the United States Attorney's Office. Id.

With this background in mind, the defendants assert that the plaintiff's complaint should be

dismissed, or they should be granted judgment as a matter of law, for the following reasons:

(1) the plaintiff's claims are not exhausted;

(2) the plaintiff's claims are barred under the applicable statute of limitations;

(3) the plaintiff has failed to establish the type of personal involvement required to maintain a Bivens[8] action;

(4) the plaintiff has failed to state a claim of retaliation;

(5) the plaintiff has failed to establish that a violation of his constitutional rights occurred; and

(6) the plaintiff has failed to state a claim that he was denied access to the courts.

## III.  Standard of Review

### A.  Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the  . . .  claim is and the grounds upon which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544,

_____

[8]Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388, 395 (1971) (authorizing suits against federal actors for violations of rights guaranteed by the United States Constitution or federal laws).

555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but "must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>Id.</u> (citations omitted), to one that is "plausible on its face," <u>Id.</u> at 570, rather than merely "conceivable." <u>Id.</u> Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E. I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir.2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir.2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, adopted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. <u>Id.</u>

**B.** **Motion for Summary Judgment**

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

## IV.   Analysis

### A.   Improper Handling of Mail/Mail Tampering

#### 1.   Defendants Leeson and Callahan

As to these defendants, the plaintiff merely asserts that as a part of their duties, Leeson and

Callahan were responsible for processing incoming and outgoing mail. The plaintiff does not allege that either of these defendants actually handled his mail or did so in an improper manner. For this reason, the plaintiff has failed to state a claim against either of these defendants and they should be dismissed from this case. See Monell v. Department of Social Services, 436 U.S. 658 (1978) (to establish personal liability against a defendant, the plaintiff must establish that the defendant was personally involved in the alleged wrongs).

### 2. Defendants White, Fernandez, Bucklew, Yost and Kovscek

In case number 3:06cv114, this Court found that the plaintiff's claims of improper handling of his mail and mail tampering were exhausted.[9] See Case No. 3:06cv114, dckt. 89, 92. Nonetheless, those claims were dismissed from that case without prejudice because they were not exhausted before the case was filed. Id. Based on the findings in that case, however, those claims were exhausted in May of 2007, and thus, prior to the filing of the instant case. Id. Thus, it appears that the plaintiff's claims of improper handling of his mail and mail tampering are exhausted. See also (Dckt. 75 at Ex. 1)

In his complaint, the plaintiff asserts that BOP staff unlawfully censored his incoming and outgoing legal mail correspondence and that they improperly handled his general correspondence after he signed a BOP form 407. The plaintiff then alleges several specific incidents in support of

---

[9]Specifically, the Court found that on September 14, 2006, the plaintiff initiated two administrative remedies regarding his mail. 3:06cv114, Dckt. 89 at 8; see also Ex. 1 at ¶ 13 and Att. F. Specifically, the first remedy complained that the plaintiff's mail from the district court and from the Regional Office should be treated as special mail. Id. The second remedy complained of mail tampering and sought an investigation. Id. Both remedies were appealed to the Regional and Central Offices. Id. A final denial was issued in May of 2007. Id.

Moreover, on October 17, 2006, the plaintiff filed two remedies which complained that his mail was being unlawfully censored. Id. Those remedies were appealed to the Regional and Central Offices and a final denial was issued in May of 2007. Id.

his claim.

First, the plaintiff asserts that in June of 2006, through general correspondence, his parents sent him newspaper clippings and articles about the Carnival parade in the Virgin Islands. (Dckt. 1 at 10) The plaintiff asserts that the clippings were determined to be contraband and destroyed. Id. He suggests that this was improper and that the clippings should simply have been returned to his parents. Id. It is clear that as general correspondence, the letter from the plaintiff's parents was properly opened and inspected. 28 C.F.R. § 540.14(a). Moreover, once they were determined to be contraband, the facility was under no obligation to return the newspaper clippings to the plaintiff's parents. 28 C.F.R. §540.13 ("contraband need not be returned to the sender"). In addition, the fact that other inmates may have received newspaper clippings does not show that the plaintiff was being harassed or treated unfairly. The plaintiff has not alleged any intentional or purposeful discrimination. See Morrison v. Garraghty, 239 F. 3d 648, 654 (4th Cir. 2001) (to be successful on an equal protection claim, the plaintiff must demonstrate "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination"). At best, he merely shows that mailroom staff misinterpreted a policy or allowed some contraband to slip through the screening process. Thus, there was no improper handling of the plaintiff's mail in this instance.

With regard to his mail, the plaintiff next asserts that on August 21, 2006, he signed an Acknowledgment of Inmate Form BP 407, discontinuing mailroom staff from receiving, opening, reading and delivering his incoming general correspondence. (Dckt. 1 at 13) The plaintiff nonetheless asserts that staff failed to comply with his request and continued to open and deliver his general correspondence through normal mail procedures. Id. at 13-14. However, in the uncontested

declaration of defendant Fernandez, she avers that after August 21, 2006, the plaintiff's general correspondence was returned to the sender. (Dckt. 75, Ex. 2 at ¶ 5). Fernandez also notes that FCI-Morgantown houses approximately 1,300 inmates and receives hundreds of pieces of correspondence every day. Id. Therefore, it is not unlikely nor unreasonable to expect that even after signing a BP form 407, some of an inmate's general correspondence mail may slip through. Id. at ¶ 14. In fact, defendant Fernandez asserts that in her six years with responsibility over the operation of the mailroom, no other inmate has ever refused to accept general correspondence mail. Id. at ¶ 13. The plaintiff's refusal therefore required a major change in the way his mail was handled, and it may have taken staff some time to receive notification of those changes. Id. However, Fernandez asserts that notice of the change and the new procedures for handling the plaintiff's general correspondence mail were implemented as quickly and efficiently as possible. Id. Because the plaintiff cannot show that the processing, if any, of his general correspondence mail after August 21, 2006 was more than a mistake or mere inadvertence, he cannot show that staff improperly handled his mail.[10]

Third, the plaintiff asserts that the defendants mishandled his mail by withholding his administrative appeals, causing them to be untimely. (Dckt. 1 at 15) Again, however, the uncontested declaration of defendant Fernandez tells another story. When she became aware of the plaintiff's claim that his administrative remedy appeals were being purposely withheld, Fernandez worked with defendant Layhue, the plaintiff's counselor, to resolve that issue. (Dckt. 75, Ex. 2 at

---

[10]To the extent that the plaintiff asserts that the mishandling of his mail after August 21, 2006 resulted in the loss of his writ of certiorari and supporting memorandum, the Court finds no merit in that claim. (Dckt. 1 at 14) Earlier in his complaint, the plaintiff asserts that his writ of certiorari and supporting memorandum were lost when his legal materials were confiscated in July of 2006. Id. at 11.

¶ 22) In doing so, the plaintiff gave Layhue a list of certified mail numbers which corresponded to the remedies in question.  Id.  Layhue gave those numbers to Fernandez who then looked them up in the outgoing certified mail log.  Id.  When she did, Fernandez discovered that the plaintiff had not sent his administrative remedies directly to the Regional and Central Offices.  Id.  Rather, he first sent them to a third party, who then forwarded the administrative appeals to the Regional and Central Office.  Id.  When advised of this, the plaintiff made no further complaints.  Id.  Because of this discovery, Fernandez avers that the issue of certifying the reason for the delay on BOP letterhead never arose because the delay was not due to mailroom staff.  Id.  Clearly, any delay in the filing of the plaintiff's administrative remedy appeals was due to the way in which he chose to send his appeals.  For that reason, the BOP had no obligation to certify the reason for the delay on BOP letterhead and these claims are without merit.

Finally, the plaintiff complains that his legal and special mail was improperly opened, read and had documents removed.  (Dckt. 1 at 18)  However, as noted by defendant Fernandez in her declaration, the plaintiff apparently does not understand the difference between general correspondence and legal/special mail.  (Dckt. 75 at ¶ 7).  The difference between the two types of mail is not dependent solely upon who is the sender or recipient.  Legal and special mail must contain the identity of the individual sender and contain the marking, "special mail, open only in the presence of the inmate."  28 C.F.R. § 540.18(a).  Mail that does not meet this criteria may be treated as general correspondence and opened, inspected and read.  § 540.18(b).  It also does not include mail received from the Bureau of Prisons, such as administrative remedy responses from the Regional and Central Offices.  § 540.2(c).

In this case, Fernandez went out of her way to accommodate the plaintiff's mail related to

his court cases, including correspondence from the United States Attorney's Office and the Regional and Central offices of the BOP, even though mail related to these situations did not necessarily meet the criteria for special mail. In addition, the plaintiff is mistaken that the district court specifically ordered the BOP to classify mail from it as special mail. Instead, the Court, recognizing that the plaintiff's mail was being returned, directed the Clerk to write "special mail, open only in the inmate's presence" on future correspondence. See Case Numbers 3:06cv114 at 7, 3:06cv72 at dckt. 48. The Clerk did so, and with the special accommodations by defendant Fernandez, it appears that the plaintiff received his mail from the Court after that time. Thus, the defendants followed the appropriate rules and regulations and even made special accommodation for the plaintiff. Accordingly, the plaintiff has failed to establish that the defendants violated his rights in this regard and the defendants are entitled to judgment as a matter of law.

## B.   Retaliation

As a preliminary matter, to the extent that the plaintiff alleges that he was retaliated against for the filing of administrative grievances, that issue was resolved in case number 3:06cv72. In that case, the Court found that the plaintiff had no constitutionally protected right to file grievances. 3:06cv72, Dckt. 64 at 2-3. Thus, he could not state a claim for relief. Id. (citing Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (finding that in order to sustain a claim for retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right"). Therefore, to the extent that the plaintiff again alleges that he was retaliated against for the filing of administrative remedies, that claim should be dismissed.

On the other hand, because inmates have a constitutional right to meaningful access to the

courts,[11] the plaintiff may state a claim of retaliation based upon his filing of lawsuits in federal court. Nevertheless, an inmate who claims he was retaliated against for filing a lawsuit must show that the retaliatory acts adversely affected his right to access the courts. <u>American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md.</u>, 999 F.2d 780, 785 (4th Cir. 1993); <u>Oliver v. Powell</u>, 250 F. Supp. 2d 593 (E.D. Va. 2002). Moreover, a plaintiff who claims that his "constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive." <u>Adams v. Rice</u>, 40 F.3d at 75. Indeed, claims of retaliation are treated with skepticism in the prison context. <u>Cochran v. Morris</u>, 73 F.3d 1310, 1317 (4th Cir.1996).

Here, the plaintiff appears to allege that every bad act or misdeed that occurred while he was housed at FCI-Morgantown, whether real or perceived, happened as a result of his filing civil cases in this court. Interestingly, the plaintiff even includes events that occurred prior to July 17, 2006, the date on which he filed his first federal action with this Court. <u>See</u> 3:06cv72. However, because a retaliatory act takes place *in response to* the exercise of a constitutional right, any event complained of that occurred prior to July 17, 2006, cannot be sustained. Accordingly, the Court will only address those retaliation claims which occurred after July 17, 2006.[12]

As to his other claims, the plaintiff seems to suggest that his legal property was confiscated because he filed a case in federal court. (Dckt. 1 at 11) He later concedes, however, that his legal

---

[11]<u>Bounds v. Smith</u>, 430 U.S. 817, 828 (1977).

[12]This eliminates any retaliation claim regarding the confiscation of the plaintiff's work boots, beard trimmers and legal property as those events occurred in March of 2006. It also eliminates any of the alleged mail tampering that occurred prior to July 17, 2006, including the destruction of the newspaper clippings sent to the plaintiff by his parents. Also eliminated are the plaintiff claims against defendant Sanders regarding his job assignment, eating times and false incident reports as those events occurred in May of 2006.

property was actually confiscated because the defendants believed that the plaintiff had a family member in the regional office.  Id.  Thus, the plaintiff cannot state a claim of retaliation with regard to the confiscation of his legal property.

The plaintiff appears to assert that his work boots were destroyed in retaliation for filing suit in federal court.  However, the record shows that the boots were confiscated on March 20, 2006.  (Dckt. 75, Ex. 3 at ¶ 5; Att. B)  Moreover, the plaintiff was told on several occasions prior to the filing of his first civil suit, that if he could provide proof of possession he would be permitted to send the boots home, otherwise the boots would be destroyed pursuant to BOP policy.  Id. at ¶ 6.  The plaintiff also filed numerous administrative remedies on the subject and was told each time that once he provided proof of ownership he could mail the boots home.  (Dckt. 75 at 20-21).  The responses to those remedies establish that the plaintiff was advised on several occasions prior to the filing of his first civil complaint that, per BOP policy, the boots would be retained for 120 days, or until ownership was proven.  (Dckt. 4 at Ex. L-N).  He was also informed that if he did not prove ownership and make arrangements to have the boots mailed to his home, they would be destroyed on July 17, 2006 (120 days from the date they were confiscated).  Id.  The boots were actually destroyed on July 20, 2006.  (Dckt. 75, Ex. 3 at ¶ 7)  Even though the actual destruction of the boots took place three days after the plaintiff filed his first suit in federal court, the destruction of the boots was consistent with the BOP's 120 day policy and with the information the plaintiff had been given prior to that time.  Thus, the record is clear that the plaintiff was given every opportunity to prove ownership of the boots and mail them home.  The boots were destroyed because the plaintiff failed to do so and pursuant to the applicable time frames set forth by BOP policy on the retention of confiscated property, not because he filed suit in federal court.

Next, the plaintiff asserts that staff retaliated against him by withholding his administrative remedy appeals and by tampering with his mail. As noted above, however, the record shows that staff did not withhold the plaintiff's administrative remedies. Rather, the untimeliness of the plaintiff's administrative remedies was due to his sending those remedies to third parties instead of sending them directly to the Regional or Central Offices. In addition, the undersigned has found that the record establishes that staff did not purposely tamper with or mishandle his mail. At best, any problems with the plaintiff's mail was inadvertent or due to mistake. Consequently, the plaintiff cannot establish a claim of retaliation as to the withholding of his administrative appeals or the mishandling of his mail.

In his amended complaint, the plaintiff makes several additional claims of harassment and retaliation.[13] For instance, he asserts that, while he was housed in the SHU, defendant Williams did not allow him to have any of his legal property in his cell or to receive telephone calls from his family. (Dckt. 10 at 3) Also while in the SHU, defendant Thompson allegedly confiscated the plaintiff's radio and threatened him. Id. In addition, defendants White and Fernandez allegedly confiscated a complaint he intended to send to the United States Postal Inspector and gave him a false address for said inspector. Id. at 4.

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action, like an action under 42

---

[13]Some of those claims were dismissed from this case in prior orders and will not be revisited herein. See Dckt. 19 & 21. Additionally, some of these claims have been addressed earlier in this opinion and will not be addressed again. See n. 9 & 11, *infra*.

U.S.C. § 1983, is subject to the exhaust of administrative remedies. <u>Porter v. Nussle</u>, 534 U.S. 516,

524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes"[14] and is required even when the

relief sought is not available. <u>Booth</u> at 741. Because exhaustion is a prerequisite to suit, all

available administrative remedies must be exhausted *prior to* filing a complaint in federal court. <u>See</u>

<u>Porter</u> at 524 (citing <u>Booth</u> at 741) (emphasis added). In addition, the Supreme Court has stated that

"we will not read futility or other exceptions into statutory exhaustion requirements . . ." <u>See</u> <u>Booth</u>

at 741 n. 6.

    The BOP makes available to its inmates a three level administrative remedy process if

informal resolution procedures fail to achieve sufficient results. <u>See</u> 28 C.F.R. § 542.10, <u>et</u> <u>seq</u>.

This process is begun by filing a Request for Administrative Remedy at the institution where the

inmate is incarcerated. If the inmate's complaint is denied at the institutional level, he may appeal

that decision to the Regional Office for the geographic region in which the inmate's institution of

confinement is located. (For inmates confined at FCI-Morgantown, those appeals are sent to the

Mid-Atlantic Regional Director in Annapolis Junction, Maryland.) If the Regional Office denies

relief, the inmate can appeal to the Office of General Counsel via a Central Office Administrative

Remedy Appeal. An inmate must fully complete each level of the process in order to properly

exhaust his administrative remedies. <u>See</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 93-94 (2006) (the PLRA

requires *full* and *proper* exhaustion).

    A review of the plaintiff's administrative remedies history shows that not only did he fail to

exhaust any of these additional claims, he never even began the process. (Dckt. 75 at Ex. 1).

---

[14]<u>Porter</u> at 524.

Because any attempt to exhaust those claims at this time would be time-barred, 28 U.S.C. §§ 542.14(a), those claims should be dismissed with prejudice.

## C.  Denial of Access to the Courts

It is well established that there is a "fundamental constitutional right of access to the courts." Bounds v. Smith, 430 U.S. at 828; see also Lewis v. Casey, 518 U.S. 343, 351 (1996).  When alleging denial of access to the courts, a prisoner must make specific allegations and  must also identify an actual injury resulting from official conduct. Cochran v. Morris, 73 F.3d 1310 (4th Cir. 1996).  "A showing of injury is required in order to avoid adjudication of trivial claims of deprivation." Id. at 1317.  Actual injury sufficient to sustain a cause of action for denial of access to the courts is present where, for example, an inmate deprived of legal materials is unable to meet court imposed deadlines as a result of the deprivation.  Roman v. Jeffes, 904 F.2d 192, 198 (3d. Cir. 1990).  Nonetheless, the injury requirement cannot be satisfied by just any type of frustrated legal claim.  Lewis v. Casey, 518 U.S. at 354.  Since Bounds, nearly all access-to-courts claims involve attempts at direct appeals, or habeas petitions, and the Supreme Court has extended the universe of relevant claims to civil actions, "only slightly."  Id.  (citing Wolff v. McDonnell, 418 U.S. 539 (1974) (extending access-to-courts claims to cases arising under 42 U.S.C. § 1983, but only when needed to vindicate "basic constitutional rights").

In this case, the plaintiff asserts that because his legal mail from the court was opened, read and had documents removed, his communications with the court were disrupted.  (Dckt. 1 at 18) Additionally, the plaintiff asserts that the defendants "held back" his mail to the Court causing him to seek extensions of time from the court.  Id.  Finally, the plaintiff asserts that in civil action 3:06cv72, the defendants' actions caused a motion to be untimely and not considered by the Court prior to its dismissal of that case.  Id. at 19.

None of the alleged instances amount to denial of access to the court. First, the plaintiff's claims do not have the requisite specificity. He does not identify any particular communication to the court which was disrupted. Moreover, having to seek an extension of time does not qualify as denial of access to the courts. Parties routinely request extensions of times for various reasons. Such extensions are generally granted. Nor does the plaintiff identify which motion was filed untimely in case number 3:06cv72. Second, the plaintiff has failed to identify any particular injury which resulted from the alleged deprivations. Even though he alleges that his communications with the court were disrupted, he does not assert that such disruption adversely affected his case. Furthermore, the plaintiff does not allege that he was ever denied an extension of time or that the Court was unwilling to accommodate him in this regard. Finally, although the plaintiff asserts that his untimely motion in 3:06cv72 was not considered by the Court prior to the dismissal of his case, this statement is inaccurate. A review of the docket in case number 3:06cv72 shows that each and every one of the plaintiff's motions was considered and ruled upon by the Court, either prior to the dismissal of the case or in the Order of Dismissal. Because the plaintiff's denial of access to the courts claim lacks the requisite specificity and fails to allege a sustainable injury, that claim fails as a matter of law.

## V.   Recommendation

For the reasons stated, the undersigned recommends that the defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dckt 72) be **GRANTED**, and this case be terminated from the active docket of this court.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those

portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208.

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record via electronic means.

DATED: September 29, 2010.


DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE